HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL R. FLEMING (SBN: 322356)
mfleming@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiff
Siddharth Breja

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIDDHARTH BREJA, an individual,<br><br>       Plaintiff,<br><br>       v.<br><br>JUUL LABS, INC., a Delaware corporation.<br><br>       Defendant. | **Case Number:  3:19-cv-7148**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>  (1) **Violations of the Fair Credit Reporting Act**<br>  (2) **Violations of the California Investigative Consumer Reporting Agencies Act**<br>  (3) **Retaliation Under Cal. Lab. Code § 1102.5**<br>  (4) **Wrongful Termination in Violation of Public Policy**<br>  (5) **Breach of the Implied Covenant of Good Faith and Fair Dealing**<br>  (6) **Violations of Cal. Bus. & Prof. Code §§ 17200,** *et seq.*<br>  (7) **Intentional Infliction of Emotional Distress**<br><br>**DEMAND FOR JURY TRIAL** |



1   Plaintiff Siddharth Breja ("Mr. Breja" or "Plaintiff"), through his attorneys, Dhillon Law Group,

2   Inc., files this Complaint for Damages and Injunctive Relief ("Complaint") against Defendant JUUL

3   Labs, Inc. ("JUUL," "Defendant," or the "Company"), and alleges as follows:

4   **INTRODUCTION**

5   1.      In total disregard for the law, public safety, and public health, JUUL has sent to

6   market, at a minimum, approximately one million mint-flavored e-cigarette nicotine pods that it

7   admits were contaminated, and against Mr. Breja's insistence and protests, refused to recall those

8   contaminated pods or even issue a product health and safety warning.

9   2.      Mr. Breja brings this action after he was terminated in retaliation for whistleblowing

10  and objecting to the contaminated pod shipment and other illegal and unsafe conduct that has

11  jeopardized and continues to jeopardize public health and safety and the lives of millions of

12  consumers, many of them children and teens.

13  3.      As demonstrated by the facts described below and in the myriad of lawsuits filed

14  against JUUL around the United States by consumers and government officials (including actions by

15  state attorneys general and district attorneys), JUUL's management, including, but not limited to,

16  former CEO Kevin Burns ("Mr. Burns"), former CFO Timothy Danaher ("Mr. Danaher"), current

17  Chief People Officer Ms. Monika Fahlbusch ("Ms. Fahlbusch") and Board of Directors, including, but

18  not limited to, representatives from JUUL's largest shareholder, Altria Group (NYSE: MO), have

19  displayed an open disregard for public health, the health of JUUL's customers, and the rule of law

20  generally.[1]

21  4.      On September 25, 2019, Mr. Burns resigned as CEO, in the shadow of what JUUL's

22  new CEO, former Big Tobacco executive K.C. Crosthwaite, called "unacceptable levels of youth

---

[1] Countless lawsuits are currently pending across the nation, alleging unlawful and unsafe practices on the part of JUUL. *See, e.g., Vail v. JUUL Labs, Inc.,* Case No. 3:19-cv-06597 (N.D. Cal.); *Cobb, et al. v. JUUL Labs, Inc.,* Case No. 4:19-cv-02446-RWS (E.D. Missouri); *Pippen v JUUL Labs, Inc. et al.,* Case No. 6:19-cv-01671-PGB-EJK (M.D. Florida); *Vermillion v. JUUL Labs, Inc.,* Case No. 4:19-cv-05286-DMR (N.D. Cal.); *Quercia v. JUUL Labs, Inc. et al.,* Case No. 1:19-cv-05664 (N.D. Ill.); *Divello v. JUUL Labs, et al.,* Case No. 2:19-cv-16915-BRM-ESK (D.N.J); *Shapiro et al v. Altria Group, Inc. et al.,* Case No. FLS/0:19-cv-61548 (Judicial Panel on Multidistrict Litigation); *Nessmith v. JUUL Labs, Inc., et al.,* 8:19-cv-00884 (M.D. Florida).  There are many more examples in both state and federal courts across the country.

Complaint for Damages and Injunctive Relief                                    Case Number: 3:19-cv-7148

usage and eroding public confidence."[2]

5.       Until he stepped down, Mr. Burns ruled JUUL in a dictatorial manner and fostered a culture of silence at the Company.[3]   For example, after an FDA raid on JUUL's headquarters in San Francisco in October, 2018, in a regular Tuesday morning executive team meeting, JUUL's executives, including Mr. Breja, were instructed by Mr. Burns not to mention anything relating to regulatory or safety issues in writing, over e-mail, texts, or even the internal messaging application, "Slack." Otherwise, Mr. Burns said, that the FDA would be able to obtain those writings in further raids or other proceedings and the Company needed to ensure that did not happen.

6.       Mr. Burns' and upper management's disregard for the health and safety of JUUL's customers, many of whom are children and young adults, are evidenced in Mr. Burns' statements such as, "***Half our customers are drunk and vaping like mo-fo's, who the fuck is going to notice the quality of our pods***."  This statement was often repeated in Company meetings by senior management to other employees, including to Mr. Breja by the Company's then-CFO, Mr. Danaher, when he reported conduct he reasonably believed to be illegal and unsafe.  In this particular instance, it was made in the context of a discussion about shipping out expired or nearly expired pods.

7.       These laws and regulations include, but are not limited to Part 1100 of Title 21 of the Code of Federal Regulations (often referred to as the "Deeming Rule"), the Lanham Act, Section 108044 of the California Health and Safety Code (Product Recall Safety and Protection Act), Sections 17200 and 17500 of the California Business and Professions Code (Unfair Competition and False Advertising Laws), Sections 1791, *et seq*. of the California Civil Code (Consumer Warranty Protections), and the California Consumer Legal Remedies Act.

8.       Rather than attempt to follow the law, as part of its very business model, JUUL has chosen to emulate some of the biggest legal violators in history.  JUUL co-founder James Monsees has openly bragged, "After the Master Settlement Agreement, the big settlement where everyone was

---

[2] JUUL Labs Names New Leadership, https://newsroom.juul.com/2019/09/25/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/.

[3] Altria invested in JUUL for its impressive growth history and future growth potential.  At the time, while Mr. Burns was delivering that growth, Altria chose to overlook Mr. Burns' dictatorial way of running the company and the Company's violation of health and safety risks, even though it was fully aware of these issues.  After public outcry, it used its power as JUUL's largest shareholder to remove Mr. Burns.



Complaint for Damages and Injunctive Relief                                    Case Number: 3:19-cv-7148

suing the tobacco companies, one of the results was that a lot of tobacco industry documentation was mandated to become public.  It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. ***And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes***."[4]  It appears that JUUL's heroes and mentors are the very tobacco companies that have been responsible for the second biggest preventable cause of death in the United States.

9.      In order to ensure its executives' and Altria's pockets remained lined with cash and in an attempt to prevent further bad press, JUUL yet again violated the law by terminating Mr. Breja's employment in retaliation, days after he blew the whistle on the Company's illegal activity.  This cold and calculated act was an attempt to silence him and to set an example for other employees, and destroy his career simply for fulfilling his fiduciary duty, and caring about JUUL's customers and the public health and reporting and protesting what he reasonably believed to be illegal activity.

## PARTIES

10.      Mr. Breja is an individual who is, and at all times relevant to this Complaint was, a resident of the City and County of San Francisco, California.  Mr. Breja was employed by JUUL in San Francisco, California.

11.      Defendant JUUL is a Delaware corporation with its principal place of business in San Francisco, California whose products are in interstate commerce.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

13.      This Court has personal jurisdiction over JUUL because it has committed the acts complained of herein in this State and in this District

14.      This Court has personal jurisdiction over JUUL for the additional reason that it has engaged in systematic and continuous contacts with this State and this District by, *inter alia*, regularly conducting and soliciting business in this State and this District, and deriving substantial revenue from products and/or services provided to persons in this State and this District.

---

[4] Chairman Raja Krishnamoorthi, *Opening Statement*, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JUUL%20Hearing%20Part%202%20-%20FINAL%20Opening%20Statement.pdf (emphasis added).

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the acts complained of herein occurred in this District.  JUUL transacts business and resides in this District.

16.     Venue is proper in this District under 28 U.S.C. §§ 1391(c)–(d) because JUUL resides in this District and has a regular and established place of business in this District.

## INTRADISTRICT ASSIGNMENT

17.     Pursuant to Local Rule 3-5(b), Mr. Breja alleges that assignment to the San Francisco Division is proper under Local Rule 3-2(e) because all parties have their principal places of business and/or reside in San Francisco, California.

## GENERAL ALLEGATIONS

### JUUL's Dangerous Business Practices

18.     JUUL designs, manufacturers, and markets unsafe vaping products that are not approved by the FDA, and continues to modify and sell products without FDA approval, in violation of the FDA's "Deeming Rule."  The "Deeming Rule" states that "[vaping] products that were not commercially marketed as of February 15, 2007, are new tobacco products.  New tobacco products require premarket authorization before they can be legally marketed.  Accordingly, new [vaping] products are legally required to be subject to an order authorizing their marketing."[5]  Therefore, new [vaping] products are legally required to be subject to an order authorizing their marketing."  While JUUL's e-cigarette was "grandfathered in," and thus not initially requiring FDA approval to remain on the market, no modification may be made to its product or any component thereof.  Any such modification, including a contamination of the eLiquid, would constitute a violation of the "Deeming Rule."  To date, Juul has failed to comply with this federal law.

19.     Contrary to JUUL's claims that "JUULing" is safe, recent studies have found that JUUL and other e-cigarettes expose users to a number of dangerous health risks, even new lung illnesses.  As of October 22, 2019, the CDC and local officials have confirmed 35 deaths among at least 1,604 cases of vaping-related injuries in every state except Alaska as well as in the District of

---

[5] Food and Drug Administration, *Modifications to Compliance Policy for Certain Deemed Tobacco Products*, https://www.fda.gov/media/121384/download.



Columbia and the U.S. Virgin Islands. These lung problems are so severe that the CDC is asking physicians around the country to report possible cases of unexplained vaping-related pulmonary illness to their state or local health department.[6]

20.    Evidence clearly shows that the use of e-cigarettes, such as those sold by JUUL, may contribute to lung disease, heart attacks, and may even cause seizures. E-cigarette aerosolized liquid may also contain carcinogens.[7] Additionally, e-cigarettes contain nicotine, which is more damaging for young users because their brain development is still in progress. Studies have also shown nicotine affects cell activity in the brain and negatively impacts the capacities for attention, learning and memory.[8]

21.    JUUL has also made misleading claims about the nicotine content in its pods.  In direct contrast to JUUL's representations that its JUUL pods contain about the same amount of nicotine as a pack of conventional cigarettes, studies have shown that JUUL's pods contain significantly higher concentrations of nicotine than that of cigarettes and absorption rates that are up to four times higher than that of cigarettes.[9]  In fact, JUUL developed a new product which it internally called the "Turbo," which would double the normal vape density allowed in some countries.

22.    For example, countries in the European Union have a restriction on nicotine concentration (i.e., setting the maximum strength (nicotine by weight) at 1.7% versus the U.S., where the strength is 5%).  JUUL's idea was to trick government regulators and consumers in those foreign jurisdictions into thinking that the "Turbo" only contained a better battery life or was no different from the standard product, despite the fact that it was intended to illegally double the vape density (in essence delivering 3.4% nicotine strength), hooking European consumers even more quickly.

---

[6] *Danielle Konsecki, More Than 150 People Experiencing Severe Lung Issues After Vaping*, https://www.cnet.com/news/vaping-hospitalized-with-lung-issues/.
[7] Elizabeth Fernandez, *Smoking E-Cigarettes Daily Doubles Risk of Heart Attack*, https://www.ucsf.edu/news/2018/02/409916/smoking-e-cigarettes-daily-doubles-risk-heart-attacks;
[8] Yael Abreu-Villa, et al., *Nicotine is a Neurotoxin in the Adolescent Brain: Critical Periods, Patterns of Exposure, Regional Selectivity, and Dose Thresholds for Macromolecular Alterations*, 979 Brain Research 114-28 (July 25, 2003), https://www.ncbi.nlm.nih.gov/pubmed/12850578; U.S. Department of Health, and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease, Prevention and Health Promotion, Office on Smoking and Health, *E-Cigarette Use Among Youth And Young Adults: A Report of the Surgeon General- Executive Summary (2016)*, https://ecigarettes.surgeongeneral.gov/documents/2016 SGR Exec Summ 508.pdf.
[9] Samantha M. Reilly, *et al., Free Radical, Carbonyl, and Nicotine Levels Produced by Juul Electronic Cigarettes, Nicotine & Tobacco Research,* https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf

23.     Mr. Burns felt quite strongly about proceeding in a win-at-all-costs, reckless fashion telling anyone who disagreed, including JUUL's EMEA President, that there could "only be one king at JUUL," and that the "king" was Mr. Burns.  In another conversation, Mr. Burns stated to Mr. Breja and other executives, "Tell that motherfucker that I'll take him out of the room and shoot him with a shotgun if he challenges my decisions."

24.     The use of e-cigarettes by American youth has surged so dramatically in recent years that the U.S. Surgeon General has declared such use an epidemic.[10] According to the CDC, e-cigarette use among middle school students increased by 48% and among high school students by 78% from 2017 to 2018. Furthermore, in 2018, about 3.6 million middle and high school students nationwide reported using e-cigarettes, including those sold by JUUL, which has a market share of 75%.[11]

25.     According to testimony by a professor in otorhinolaryngology at Stanford University, Dr. Robert Jackler, JUUL is mimicking Big Tobacco's past marketing practices, preying on youth to recruit smokers for pure financial gain.[12]

26.     Indeed, on December, 19 2018, Altria announced an offer of $12.8 billion for a 35% share of JUUL. The deal combines Altria (formerly Philip Morris), the company with the largest share of the US cigarette market, with JUUL.  The acquisition price was based on JUUL's valuation of $38.5 billion. Altria sells Marlboro in the US, the country's most popular cigarette.[13]

27.     JUUL now uses the very same youth marketing business practices previously declared to violate federal law. In a 2018 interview, one of JUUL's co-founders even admitted publicly that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that the

---

[10] Rob Stein, *Surgeon General Warns Youth Vaping Is Now An "Epidemic,"* https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vapingis-now-an-epidemic; https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vapingis-now-an-epidemic.
[11] U.S. Department of Health, and Human Services, Centers for Disease Control and Prevention, *Tobacco Use By Youth Is Rising E-cigarettes Are the Main Reason*, https://www.cdc.gov/vitalsigns/youth-tobacco-use/.
[12] Robert K. Jackler, MD, *The Role of the Company in the JUUL Teen Epidemic - Testimony for House Subcommittee on Economic and Consumer Policy (July 24, 2019)*, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Jackler%20Testimony.pdf; *see also JUUL Targeted Children at Schools and Online, U.S. House Panel Says*, https://www.bloomberg.com/news/articles/2019-07-26/juul-targeted-children-at-schools-andonline-u-s-house-panel-says.
[13] David T Levy, *et al.*, *Altria-Juul Labs Deal: Why Did It Occur and What Does It Mean for the US Nicotine Delivery Product Market*, *https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/08/30/tobaccocontrol-2019-055081.full.pdf.*

Complaint for Damages and Injunctive Relief                                    Case Number: 3:19-cv-7148

Stanford Research into Impact of Tobacco Advertising, a collection of data regarding harmful tobacco advertising, had been quite useful to them.[14]

28.    While awaiting approval of its deal with Altria, JUUL is currently under investigation by the FTC for its dubious marketing practices.[15]

29.    JUUL has demonstrated that it will violate the law for its financial gain and that of its executives.  Upon information and belief, JUUL has modified its products and sold them without FDA approval, in violation of the "Deeming Rule".

30.    The above-referenced safety and marketing concerns have prompted numerous lawsuits, a public outcry, and increased scrutiny by regulatory agencies and local governments, including, but not limited to, civil and criminal investigations by the FDA, the CDC, the FTC, district attorneys, and state attorneys general.

31.    Earlier this year, even Congress took a keen interest in JUUL's unlawful practices.  In July 2019, the House Committee on Oversight and Reform held a two-day hearing in which leading experts testified and JUUL's executives were called to explain themselves.[16]  To date, upon information and belief, JUUL has not complied with the Congressional probe, and the FDA has expressed concerns that JUUL has withheld documents.[17]

32.    In an effort to avoid further scrutiny, JUUL has said that it would stop flavored JUUL pod sales to its approximately 90,000 retail stores, and instead would "make mango, fruit, creme, and cucumber available only on JUUL.com."[18]  But JUUL purposefully and improperly classifies mint-flavored pods as "menthol" (supposedly not a "flavor") so that it can continue to sell those pods in retail stores.

---

[14] Robert K. Jackler, M.D., *et al.*, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019).
[15] Jennifer Maloney, *Juul's Marketing Practices Under Investigation by FTC*, https://www.wsj.com/articles/juuls-marketing-practices-under-investigation-by-ftc-1567096073.
[16] Examining JUUL's Role in the Youth Nicotine Epidemic: Parts I and II, https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-i; https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.
[17] Angelica LaVito, *Congress threatens to subpoena JUUL, saying vaping company isn't cooperating with probe*, https://www.cnbc.com/2019/09/18/congress-threatens-to-subpoena-juul-says-vaping-giant-not-complying-with-probe.html.
[18] JUUL Labs' Action Plan, https://newsroom.juul.com/2018/11/13/juul-labs-action-plan/.



Complaint for Damages and Injunctive Relief                                    Case Number: 3:19-cv-7148

33. The withdrawal of flavored pods from retail stores did nothing more than increase the demand for mint-flavored pods.  In fact, the share of mint pods as a percentage of JUUL's total pod sales increased from approximately one-third in September 2018 to around two-thirds in February 2019, corresponding with a clampdown in the sale of the flavored pods their retail channels sold out.

34. But while demand for mint-flavored pod sales increased, retail stores were out-of-stock and could not meet customer demand.

35. Angered by the Company's financial losses due to the low stock of mint-flavored pods, JUUL's CEO at the time, Mr. Kevin Burns, directed his frustration towards supply chain and sales team leaders.

36. In pursuit of increasing JUUL's valuation, which directly impacts the value of stock held by executive management, the Company's leaders began to increase pressure on the supply chain team and its suppliers, such as the provider of Mint eLiquid, Alternative Ingredients, Inc. to produce more mint-flavored pods in order to make up for sales losses. This compromised the quality control measures, as the focus was on producing and selling mint-flavored pods at any cost, even when the product turned out not to be safe.

37. So intent on increasing sales of mint pods, Mr. Burns berated employees, telling them, "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."

38. Mr. Burns' candid internal statements stand in stark contrast to what JUUL's founders told the public in their Time Magazine interview.  In that interview, Adam Bowen said, "We're more than willing to take any cut in sales or revenue to do the right thing and prevent underage use."[19]  But JUUL always knew that its sales would not suffer because the mint pods, given its fruity flavor, would make up for any lack of sales of the other flavored pods.  This was confirmed through research conducted by McKinsey & Co., a strategy consulting firm retained by JUUL, of which Mr. Burns is a former employee.

**Mr. Breja Has a Long History of Academic Excellence and Success in Business**

39. Mr. Breja is an accomplished finance professional with a reputation for ethics, professionalism, and business acumen. He first and foremost cares about his fiduciary responsibility to

---

[19] Jamie Ducharme, *Pulling Flavored E-Cigs Hurt Sales in a 'Very Meaningful' Way, Juul Founders Say,* https://time.com/5574084/juul-adam-bowen-james-monsees-time-100-gala/.



Complaint for Damages and Injunctive Relief                                    Case Number: 3:19-cv-7148

customers and investors alike, and cares deeply about public safety and the trust the public places in companies to ensure that their basic health and safety are protected.

40.     Mr. Breja completed his undergraduate degree in mathematics at St. Stephen's College in New Delhi, India, where he graduated with honors.  St. Stephen's College is consistently ranked in the top three colleges in India, and has one of the most selective admissions criteria in the country. During Mr. Breja's undergraduate studies, he was an award winner at the Undergraduate Mathematical Olympiad in 1997.

41.     After working for four years in India, Mr. Breja came to the United States in 2004 to obtain his MBA from The Ohio State University, Fisher College of Business, where based on his performance in his first year of study, he was selected by two of his professors to assist them in their consulting work. In return, the university paid Mr. Breja's full tuition and awarded him a scholarship for housing, as well as a monthly stipend.

42.     Since receiving his MBA, Mr. Breja has worked in finance for over thirteen years at large, public and private companies, including Capital One, eBay, Amazon, and Uber.

43.     As a hard-working immigrant from India, Mr. Breja has constantly progressed in his career and has been actively recruited by some of the world's top companies, known for being mission driven and customer-centric, for roles that required strong ethics and sense of fiduciary responsibility toward shareholders and customers alike.

44.     Mr. Breja's reputation in the business world has also led him to be invited to speak at a variety of leadership conferences and meetings.

45.     During the course of his career, Mr. Breja has hired, coached, and mentored numerous corporate executives, and has played a key role in helping companies recruit top talent.

**Mr. Breja Is Recruited to Join JUUL as Its SVP of Finance**

46.     Upon information and belief, JUUL's executives had been following Mr. Breja's career and the Company had a strong interest in hiring him for his financial and business acumen.

47.     On or about April 30, 2018, one of Mr. Breja's former colleague at Uber introduced Mr. Breja to Mr. Burns, who wanted to speak with Mr. Breja about a potential role at JUUL.



Complaint for Damages and Injunctive Relief                                    Case Number: 3:19-cv-7148

48. On or about May 7, 2018, Mr. Breja had the first of several meetings with Mr. Burns at JUUL's office where he also introduced Mr. Breja to Mr. Danaher, JUUL's then-CFO.

49. On or about May 10, 2018, Mr. Breja had a follow-up phone conversation with Mr. Danaher during which he asked Mr. Breja to interview for the open role of Senior Vice President-Finance. Mr. Danaher promptly followed-up the conversation by sending Mr. Breja a recruiting deck, which stated that JUUL's mission was "to improve the lives of the world's one billion adult smokers by being their preferred alternative to cigarettes and delivering the most satisfying experience", and contained other tall claims about JUUL's growth and its future potential without disclosing any of the risks that the business faced or the simple fact that JUUL products in the United States are not approved by FDA. In fact, it had one page entitled "Regulators and Stakeholders Have Expressed Support for Harm Reduction Through ENDS (Electronic Nicotine Delivery Systems)", which took selective comments from a few regulators to create a false perception of how safe "JUUL'ing" is.

50. On or about May 15, 2018, Mr. Breja attended interviews with a number of top JUUL executives.

51. The next day, on or about May 16, 2018, Mr. Breja was asked to attend two more interviews. Mr. Breja's interviews went very well and Mr. Breja was told that he would be offered the position of SVP of Finance.

52. On or about May 21, 2018, even though he had already been offered the position verbally, Mr. Breja shared three references with Mr. Danaher, per Mr. Danaher's request. Upon information and belief, Mr. Danaher called two of Mr. Breja's three references himself and never called Mr. Breja's third reference. Two of the references were Mr. Breja's colleagues at Amazon, and one overlapped with Mr. Breja at both eBay and Amazon.

53. Later the same day, Mr. Breja crafted and sent Mr. Danaher a spreadsheet to communicate his expectations regarding salary, benefits, and equity.

54. On or about May 22, 2018, Mr. Breja received the initial draft of JUUL's offer letter.

55. On or about May 23, 2018, while Mr. Breja was in New York on a vacation, he scheduled a call with Mr. Danaher to discuss the changes he expected to be made to the offer letter. Mr. Danaher agreed to Mr. Breja's proposed changes.



56.     Mr. Breja then received a background check from Chekr, a third-party background check service, which Mr. Breja diligently completed the same day.

57.     On or about May 24, 2018, Mr. Breja shared his job description and salary details at his last employer, Uber, with JUUL's human resources personnel.

58.     Despite not being listed as references, and without Mr. Breja's consent, Mr. Danaher decided to reach out to Mr. Breja's manager at his last employer, Uber on LinkedIn, a professional networking website, and later went so far as to have a call with him regarding Mr. Breja's work history and qualifications, particularly the role and title he held at Uber.

59.     In addition, another senior executive on Mr. Breja's JUUL interview panel, called another of Mr. Breja's colleagues at Uber, to discuss Mr. Breja's role and reputation at Uber.

60.     As Mr. Breja later came to learn, such informal, "back-channel" checks were not unusual. Mr. Danaher even asked JUUL's retained recruiting firm, to research Mr. Breja's qualifications, background, and reputation.

61.     On or about May 24, 2018, Mr. Danaher sent Mr. Breja the final version of his offer letter (the "Offer Letter") via DocuSign, which Mr. Breja signed the same day.

62.     On May 29, 2018, Mr. Breja began his employment as SVP – Finance with JUUL, a title that was later updated to SVP, Global Finance to more accurately capture Mr. Breja's role of owning JUUL's global profit and loss, which involved overseeing North America Commercial Finance, General & Administrative Finance, Corporate Financial Planning & Analysis, and Supply Chain Finance as well as EMEA and APAC Finance teams.

63.     Having spent his career in well-respected companies, Mr. Breja had reservations about working for a company in the "vice" industry.

64.     However, Mr. Breja decided to join JUUL because he was convinced by the series of discussions with the Company's CEO, CFO and others in which he was promised that JUUL is true to its stated mission of providing a less harmful product for adult smokers and true to the following values:

- "Mission First: Converting smokers and eliminating cigarettes are at the center of all we do. Positively impact global health and be worthy of the highest social trust."

- "Do Right: Know what's wrong and do what's right. Act with conviction and integrity."
- "Debate and Commit: Question and disagree with candor, then be decisive and execute."
- "Act Together: Share information, respect diverse views and build trust. Empower each other and have fun as a team."
- "Deliver Excellence: Put quality first, deliver the best consumer experience and achieve distinctive results, every time."

65. In addition to his base salary and annual bonus, Mr. Breja was promised signing and retention bonuses, subject to his remaining employed with the Company for at least a year. JUUL also offered him shares of its common stock, of which the first twenty-five percent would vest on the first anniversary of his start date, and on a monthly basis thereafter for thirty-six months.

66. Mr. Breja's success at JUUL cannot be legitimately questioned. Mr. Breja worked tirelessly and delivered outstanding results during his tenure at JUUL and was consistently given feedback reflecting the same. For example, as recently as January 22, 2019, Mr. Breja's scope of responsibilities increased as he was assigned to lead the EMEA Finance team, a fast-growing strategic business segment of JUUL. Mr. Danaher even complimented Mr. Breja on his outstanding performance in his annual performance review delivered on March 19, 2019, fewer than two days before Mr. Breja's employment was abruptly terminated.

**JUUL Executives' Comments Show That Profits and Market Share Trump Safety and the Law**

67. During the first few months of his employment, everything seemed to be going well for Mr. Breja, but things began to change in February 2019.

68. In an executive team meeting on or about February 5, 2019, the topic of expired JUUL products came up because some of the inventory that was returned from a distributor was close to being one-year-old. The Company intended to resell the old product. Reasonably believing that selling expired product would constitute fraud and false advertising, given JUUL's advertisements on its website that the pods "do not expire for at least a year, ... are meant to be used soon after purchase, [and that] [a]fter a year you may notice the flavor or quality decrease," Mr. Breja protested resale of

Complaint for Damages and Injunctive Relief                    Case Number: 3:19-cv-7148

the old, expired product.

69.     Mr. Breja also suggested that, in order not to mislead the public, the Company should include an expiration date or "best by" date or at the very least a date of manufacture on the packaging.  In response, Mr. Burns dismissed Mr. Breja's report and responded by saying, "*Half our customers are drunk and vaping like mo-fo's, who the fuck is going to notice the quality of our pods*."  In essence, Mr. Burns told Mr. Breja that he did not care about his concerns, and that he thought JUUL's customers were so addicted to its products and too stupid to notice any problems.

70.     Mr. Breja understands that the Company did eventually resell the old product, which was likely more than one-year-old at the time customers would consume them, and still sells products without mentioning the date of manufacture on the packaging.

**JUUL Terminates Mr. Breja for Raising Concerns Regarding Legal and Safety Violations**

71.     On or about March 7, 2019, it was brought to Mr. Breja's attention that a batch of "Mint Refill Kits" containing the mint flavoring and nicotine had been contaminated. The contaminated "Mint Refill Kits" had been traced to two batches of JUUL's eLiquid.

72.     On or about March 12, 2019, in an executive team meeting, Mr. Breja learned that some batches of Mint eLiquid have been found to be contaminated and approximately 250,000 "Mint Refill Kits", the equivalent of *one million pods*, manufactured with this contaminated eLiquid have already been shipped to retailers and being sold to customers.

73.     This public safety issue deeply concerned Mr. Breja, as he was first and foremost concerned about public welfare, especially in the wake of consumers recently having reported suffering seizures due to the use of JUUL's products.  Mr. Breja was at the same time asked to recover approximately $7,000,000 from the supplier of this eLiquid, Alternative Ingredients, Inc., for the contaminated eLiquid batches.  This hypocritical approach of not informing the customers about the contamination on one hand (claiming it was not a serious issue) and charging the supplier for it on the other hand, further concerned Mr. Breja.

74.     That same day, during his regular weekly meeting with his supervisor, Mr. Danaher, Mr. Breja protested JUUL's refusal to issue a product recall for the contaminated pods, or at a minimum, issue a public health and safety notice to consumers.  Mr. Breja believed that not doing so

was not only illegal and an ethical violation, but also exposed the Company and its investors to a very high risk.  He believed in its greed for short term profits and enrichment, JUUL was exposing itself to long-term risks.

75.     Mr. Danaher was angered by Mr. Breja's comments and questioned his financial acumen since both of Mr. Breja's suggestions would lead to billions of dollars in lost sales, a tarnished company image, damage to JUUL's brand reputation, jeopardizing JUUL's PMTA (Premarket Tobacco Product Application), and a significant reduction in JUUL's valuation, which would impact Mr. Danaher's and Mr. Burns' personal net worth, given that they are principally compensated in JUUL stock.

76.     Undeterred by Mr. Danaher's offensive outburst, Mr. Breja continued to raise concerns to Mr. Danaher about the contaminated pods. Specifically, Mr. Breja voiced his concern that JUUL's claims and statements to the public that the Company had "implemented robust quality controls … label[ed] its products with ingredient disclosures and health warnings" …[that] device and manufacturing facilities were "subject to numerous quality and certification standards," and that "JUUL devices and JUULpods are inspected before leaving [its] manufacturing facilities, undergoing rigorous testing in a wide variety of scenarios, and are specifically designed with multiple protections, while charging and in use" were false.[20]  Mr. Breja reasonably believed this to constitute illegal false advertising.

77.     Along the same lines, Mr. Breja also questioned Mr. Danaher as to why JUUL refused to include an expiration date, a "best by" date or at the very least, a "date of manufacture" on its products.  Mr. Breja reasonably believed the fact that JUUL did not include this information constituted a violation of law.

78.     In response to Mr. Breja's concerns that the Company was violating the law, as well as ethical rules, and exposing the company to risk, Mr. Danaher told Mr. Breja that he should remember his loyalty to JUUL. Mr. Danaher added that Mr. Breja's stock was unvested and that stockholders

---

[20] JUUL Labs' Commitment To High Manufacturing and Quality Standards, https://newsroom.juul.com/juul-labs-commitment-to-exacting standards/?utm_source=Iterable&utm_medium=email&utm_campaign=id_789645_name_ST_NLYP_09_16_19_JL_Quality



Complaint for Damages and Injunctive Relief                    Case Number: 3:19-cv-7148

would lose significant personal wealth should he make his concerns public. Mr. Danaher's comments disgusted and repulsed Mr. Breja, whose primary concern was for customer health and safety.

79.      The very next week, on March 21, 2019, at approximately 5:00 p.m., Mr. Danaher summoned Mr. Breja to a meeting. During that meeting, Mr. Danaher and an JUUL's Chief People Officer, Ms. Fahlbusch told Mr. Breja that his employment had been terminated with immediate effect.

80.      They both gave Mr. Breja several contrived reasons for his termination, none of which were accurate, nor had they ever been raised with Mr. Breja prior to his termination.

81.      One of the fabricated reasons for Mr. Breja's termination was the allegation that after more than nine months in the job, Mr. Breja claimed that he was the CFO at Uber, his last employer and a well-known company in San Francisco, CA.  But Mr. Breja never claimed that; instead he stated that he operated as the CFO of a division of Uber.  JUUL's claim is preposterous and belied by the fact that Mr. Breja had shared his resume and his job description at Uber with Mr. Danaher and other JUUL interviewers in advance of commencing his employment at JUUL, despite the job description never having been formally requested.  But Mr. Breja had fully cooperated with the background checks prior to his employment and did not even object when Mr. Danaher reached out to his former manager at Uber without his consent or knowledge.

82.      JUUL's fabricated justifications for terminating Mr. Breja were not only false, they were supposedly based on an impromptu background check to which Mr. Breja never consented to and a copy of which he never received, despite requesting it.  Such actions violated both the Fair Credit Reporting Act and California's Investigative Consumer Reporting Agencies Act.

83.      JUUL intentionally invented these false justifications to hurt Mr. Breja's industry reputation and his future prospects of gaining employment, and most importantly, to set an example for other employees that whistleblowing would cost them their careers, and also to pressure him to sign the release presented to him during the termination meeting on March 21, 2019.

84.      When Mr. Breja attempted to take notes during the termination conversation, Mr. Danaher told him that he was not allowed to do so.

85.      As a result of his unlawful, retaliatory termination by JUUL two months before his



one-year anniversary with the Company, Mr. Breja never received the bonuses or equity he was promised.

86.     JUUL has forced Mr. Breja to forfeit his unvested restricted stock units (RSU's) valued in the eight figures at its current valuation.  In addition, Mr. Breja was to have been paid an amount in the seven figures in cash compensation over the next several years.  Given the Company's growth and Mr. Breja's success, it is likely that he would have remained employed by JUUL for quite some time, certainly the four years required to fully vest in his RSUs, absent JUUL's illegal conduct in terminating him.

## FIRST CAUSE OF ACTION

### Violations of the Fair Credit Reporting Act

### (15 U.S.C. § 1681, *et seq.*)

87.     Mr. Breja alleges and incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

88.     JUUL willfully violated 15 U.S.C. § 1681b(b)(2)(A)(i) because it failed to provide Mr. Breja "clear and conspicuous" notice in a written document that consists solely of the disclosure that it may procure consumer background reports for employment purposes.

89.     JUUL willfully violated 15 U.S.C. § 1681b(b)(2)(A)(ii) because it failed to obtain written authorization from Mr. Breja prior to obtaining a consumer background report for employment purposes.

90.     JUUL willfully violated 15 U.S.C. § 1681b(3)(A)(i) because it failed to provide Mr. Breja with a summary of his rights under the FCRA prior to taking adverse actions against him, including termination of his employment.

91.     JUUL willfully violated 15 U.S.C. § 1681b(b)(2)(A)(ii) because it failed to provide Mr. Breja a copy of his consumer background reports prior to taking adverse actions against him, including termination of his employment.

92.     Mr. Breja seeks statutory damages situated for these violations pursuant to 15 U.S.C. § 1681n(a)(1)(A).

93.     Mr. Breja seeks punitive damages for these violations pursuant to 15 U.S.C. §

1681n(a)(2).

**SECOND CAUSE OF ACTION**

**Violations of the California Investigative Consumer Reporting Agencies Act**

**(Cal. Civ. Code § 1786.10, *et seq.*)**

94.     Mr. Breja alleges and incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

95.     JUUL willfully violated Cal. Civ. Code § 1786.16(2)(B) because it failed to provide Mr. Breja "clear and conspicuous" notice of the following in a written document that consists solely of the disclosure: (1) that it may procure a consumer background report for employment purposes; (2) the permissible purpose of the report; (3) that the disclosure may including information on the consumer's character, general reputation, personal characteristics, and mode of living; (4) identification of the name, address, and telephone number of the investigative consumer reporting agency conducting the investigation; (5) notification of the nature and scope of the investigation requested, including a summary of the provisions of Cal. Civ. Code § 1786.22.

96.     JUUL willfully violated Cal. Civ. Code § 1786.16(a)(2)(C) because it failed to obtain written authorization from Mr. Breja prior to obtaining a consumer background report for employment purposes.

97.     JUUL willfully violated California Civil Code § 1786.16(b)(1) because it failed to provide, by means of a box to check on a written form, the opportunity to request and receive a copy of the consumer background report obtained for Mr. Breja.  JUUL also willfully violated Cal. Civ. Code § 1786.16(b)(1) because if failed to provide Mr. Breja with a copy of his consumer background report within three days of request.

98.      Mr. Breja seeks statutory damages for these violations pursuant to Cal. Civ. Code § 1786.16(2)(B).

99.     Mr. Breja seeks punitive damages for these violations pursuant to Cal. Civ. Code § 1786.50(b).

**THIRD CAUSE OF ACTION**

**Retaliation in Violation of Cal. Lab. Code § 1102.5**

100.    Mr. Breja alleges and incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

101.    Defendant JUUL was Mr. Breja's employer as that term is defined under Cal. Lab. Code § 1102.5.

102.    Mr. Breja was an employee as that term is defined under Cal. Lab. Code § 1102.5.

103.    JUUL's then-CEO, Mr. Burns, its then-CFO, Mr. Danaher, its Chief People Officer, Ms. Fahlbusch, all three Mr. Breja's superiors, were persons with authority over him under Cal. Lab. Code § 1102.5.

104.    Messrs. Burns and Danaher's actions against Mr. Breja on behalf of and with the full support of JUUL's board, as alleged above, constitute unlawful retaliation in violation of California Labor Code § 1102.5, as JUUL terminated Mr. Breja's employment because he reported to them what he believed to be violations of state and federal laws and regulations by them and the Company.

105.    As a direct and proximate result of JUUL's retaliatory termination of Mr. Breja, as alleged above, Mr. Breja has been harmed.

106.    Mr. Breja has suffered the loss of, *inter alia,* his substantial salary, benefits, bonuses, and RSUs that he would have received had he not been retaliated against by JUUL.  As a result of such retaliation, Mr. Breja has suffered such damages in an amount according to proof at trial.

107.    As a further direct and proximate result of JUUL's conduct, Mr. Breja has suffered a loss of financial stability, loss of future earning potential, damages to his reputation, and has suffered embarrassment, humiliation, mental and emotional pain and distress.

108.    As a further proximate result of JUUL's retaliatory actions against Mr. Breja, as alleged above, Mr. Breja has and continues to incur attorneys' fees and costs to enforce his rights, which Mr. Breja will seek to recover pursuant to Cal. Civ. Proc. Code §1021.5.

109.    JUUL committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Mr. Breja, with an evil and improper motive amounting to malice, and in conscious disregard of Mr. Breja's rights. Thus, Mr. Breja is entitled to recover punitive damages from JUUL.

1

## FOURTH CAUSE OF ACTION

2

### Wrongful Termination in Violation of Public Policy

3      110.    Mr. Breja alleges and incorporates by reference the allegations in each of the preceding

4    paragraphs as if fully set forth herein.

5      111.    The discharge of an employee in retaliation for protesting and refusing to take part in

6    what the employee reasonably believes violates state and federal laws and regulations contravenes

7    those laws and the policies underlying them, and gives rise to a common law action for wrongful

8    termination.

9      112.    Mr. Breja was illegally terminated for engaging in activity protected under Cal. Lab.

10   Code § 1102.5, namely by reporting and refusing to take part in conduct he reasonably believed to be

11   a violation of state and federal laws and regulations.

12     113.    JUUL's arguments for terminating Mr. Breja's employment are false and merely

13   pretextual in nature, and were calculated to disguise the retaliatory basis underlying Mr. Breja's illegal

14   termination.

15     114.    As a direct and proximate result of JUUL's retaliatory termination of Mr. Breja, as

16   alleged above, Mr. Breja has been harmed.

17     115.    Mr. Breja has suffered the loss of, *inter alia,* his substantial salary, benefits, bonuses,

18   and RSUs that he would have received had he not been retaliated against by JUUL.  As a result of

19   such retaliation, Mr. Breja has suffered such damages in an amount according to proof at trial.

20     116.    Mr. Breja has suffered a loss of financial stability, loss of future earning potential,

21   damages to his reputation, and has suffered embarrassment, humiliation, mental and emotional pain

22   and distress.

23     117.    JUUL committed the acts alleged herein oppressively and maliciously, with the

24   wrongful intention of injuring Mr. Breja, with an evil and improper motive amounting to malice, and

25   in conscious disregard of Mr. Breja's rights. Thus, Mr. Breja is entitled to recover punitive damages

26   from JUUL.

27

28

## FIFTH CAUSE OF ACTION



19

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

118.    Mr. Breja alleges and incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

119.    Both parties to an employment relationship have a duty not to do anything that prevents the other party from receiving the benefits of their agreement.

120.    Mr. Breja and JUUL entered into an employment relationship in May, 2018.

121.    Mr. Breja dutifully performed his job duties throughout his tenure with the Company.

122.    Mr. Breja's Offer Letter, attached hereto as **Exhibit A**, contained an implied covenant of good faith and fair dealing that required JUUL to refrain from doing anything that would impair, destroy, or injure the rights of Mr. Breja to receive the benefits of his employment with the Company, including, but not limited to, his right to full vesting of his RSUs.

123.    JUUL violated the implied covenant of good faith and fair dealing when it illegally terminated Mr. Breja in an attempt to prevent him from reaching his vesting cliff, thus causing him to forfeit his RSUs.

124.    JUUL's bad faith breach of the implied covenant of good faith and fair dealing has destroyed Plaintiffs' ability to receive the benefit of the bargain under his Offer Letter.

125.    As a direct and proximate result of JUUL's breach of the covenant of Mr. Breja, as alleged above, Mr. Breja has been harmed.

126.    Mr. Breja has suffered the loss of, inter alia, the RSUs that he would have received had he not been prematurely terminated by JUUL.  As a result of such termination, Mr. Breja has suffered such damages in an amount according to proof at trial.

127.    As a further direct and proximate result of JUUL's conduct, Mr. Breja has suffered a loss of financial stability, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress.

128.    JUUL committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Mr. Breja, with an evil and improper motive amounting to malice, and in conscious disregard of Mr. Breja's rights. Thus, Mr. Breja is entitled to recover punitive damages from JUUL.



Complaint for Damages and Injunctive Relief                         Case Number: 3:19-cv-7148

## SIXTH CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

129.    Mr. Breja alleges and incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

130.    Cal. Bus. & Prof. Code §§17200 et seq. (also known as the "UCL") prohibits unfair competition.

131.    Under Cal. Bus. & Prof. Code §§17200, unfair competition is defined as "any unlawful, unfair or fraudulent business act or practice."  Violations of other statutes and laws, including, but not limited to, 15 U.S.C. § 1681, Cal. Civ. Code § 1786.10, Cal. Lab. Code § 1102.5, as alleged herein, constitute unfair, unlawful, or fraudulent business practices.  Such violations also violate the UCL and give rise to a claim for relief as specified in Bus. & Prof. Code §17203.

132.    Mr. Breja has suffered actual injury as a result of unfair competition as described above, including JUUL's unlawful, unfair, or fraudulent business acts and practices.

133.    By such violations JUUL has enriched itself to the detriment of Mr. Breja and others similarly situated.

134.    By committing the acts and practices alleged herein, JUUL engaged in, and continues to engage in, unfair competition within the meaning of Cal. Bus. & Prof. Code §§ 17200, et seq., and Mr. Breja continues to suffer harm from these actions.  Therefore, Mr. Breja is entitled to injunctive relief prohibiting the continuation of such business acts and practices and requiring Mr. Breja's reinstatement.

135.    Mr. Breja asks the Court to order JUUL to pay restitution to compensate him for his losses based on JUUL's violations of the UCL, to pay attorneys' fees and costs, and to enjoin JUUL from continuing to violate the UCL as alleged herein.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

136.    Mr. Breja alleges and incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

137.    As discussed herein, JUUL intentionally and recklessly caused severe emotion distress



to Mr. Breja in multiple ways.

138.    JUUL intentionally and recklessly caused severe emotional distress to Mr. Breja by unlawfully terminating his employment in violation of state and federal law, including, but not limited to, Cal. Lab. Code § 1102.5.

139.    JUUL's conduct, as discussed herein, was so outrageous that it caused humiliation, shame, shock, anxiety, and severe emotional distress to Mr. Breja.

140.    JUUL intended to cause Mr. Breja emotional distress, or acted with reckless disregard of the probability that Mr. Breja would suffer emotional distress.

141.    JUUL's conduct was a substantial factor in causing Mr. Breja's severe emotional distress and related damage.

142.    JUUL committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Mr. Breja, with an evil and improper motive amounting to malice, and in conscious disregard of Mr. Breja's rights. Thus, Mr. Breja is entitled to recover punitive damages from JUUL.

### PRAYER FOR RELIEF

Wherefore, Mr. Breja respectfully prays for relief and judgment against JUUL, as follows, in amounts according to proof at trial but which exceed the minimum jurisdiction of this Court:

1.    For judgment in favor of Mr. Breja against JUUL;

2.    For injunctive relief, including, but not limited to, requiring JUUL to create a hotline for employee whistleblowers, to issue a prompt recall of the contaminated pods, to reinstate Mr. Breja;

3.    For compensatory and special damages as set forth throughout the complaint according to proof with prejudgment interest thereon to the extent allowable by law;

4.    For damages for severe emotional distress, humiliation, grief, nervousness, worry, sadness, anger, frustration, embarrassment, helplessness, stress, and related emotional and mental anguish in amount to be determined by the jury at the trial of this matter.

5.    For damages for future loss of earnings, bonuses and benefits, in spite of continuing attempts at mitigating damages, in an amount to be determined by the jury at the trial of this matter;

6.    For statutory damages;



7.      For exemplary and punitive damages in a sum sufficient to deter JUUL's conduct;

8.      For disgorgement of JUUL's profits as a result of their unlawful business practices;

9.      For all reasonable attorney fees incurred by Mr. Breja in the prosecution of this matter, as permitted by statute, contract, and/or applicable law;

10.     For costs of suit incurred herein; and

11.     For such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Mr. Breja hereby demands a trial by jury of all issues so triable under Fed. R. Civ. P. 38 and other applicable law.


Date: October 29, 2019                          DHILLON LAW GROUP INC.


                                   By:     _/s/ Harmeet K. Dhillon_____
                                           Harmeet K. Dhillon
                                           Michael R. Fleming
                                           *Attorneys for Plaintiff Siddharth Breja*



Complaint for Damages and Injunctive Relief                          Case Number: 3:19-cv-7148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A



Complaint for Damages and Injunctive Relief                    Case Number: 3:19-cv-7148

DocuSign Envelope ID: B343FD96-FC22-43E2-9765-B9ED97257ABB



May 22, 2018



Re:  JUUL Labs, Inc. Offer of Employment

Dear Sid,

On behalf of JUUL Labs, Inc., a Delaware corporation (the "Company"), we are pleased to offer you full-time employment in the position of **SVP Finance** subject to the following terms and conditions. Your expected first day of employment is **May 29, 2018.**

<u>Base Cash Compensation</u>
As a full-time employee in the position of **SVP Finance** you will initially earn a base salary at the twice-monthly rate of $1█████ (your "Base Salary" annualized at ██████ per year).

<u>Yearly Cash Bonus</u>
Commencing with calendar year 2018, you are eligible to receive a pro-rated target bonus of ████ of your Base Salary ("Yearly Bonus"). The Yearly Bonus will be considered on a semi-annual basis and dependent on achievement of your goals (see below) you will be eligible for payment twice a year. The Yearly Bonus is discretionary and can only be granted by the Board of Directors (the "Board") or Compensation Committee, and will be pro-rated for partial employment. The Yearly Bonus pay out is contingent on remaining employed by the Company through the payment date.

Your personal goals for 2018 will be established within the first thirty days after start of your employment. Thereafter, goals will be established after the start of each fiscal year, as applicable.  Your goals will likely include a mix of Company goals (which may include, among other things, goals related to sales, EBITDA, installed base of users, consumer engagement, new product launches) and personal key performance indicators ("Personal KPIs"), both which will have applicable weighting as determined by the Board, CEO and/or CFO in their sole discretion.

<u>Retention Bonuses</u>
In addition, you will receive a retention bonus of █████ should you remain employed with the Company for twelve full months from your start date, and an additional █████ retention bonus should you remain employed with the Company for twenty-four months from your start date.

<u>Sign-On Bonus</u>
In addition, you will be granted a one-time sign on bonus of █████ which will be subject to required taxes and withholdings and to be paid within 30 days after your Start date ("Sign-on Bonus). You acknowledge and agree to immediately pay back the pro-rated portion of this amount (determined by the Sign-on Bonus divided by 12 months multiplied by the number months remaining to the first year anniversary as of the date of separation from the Company) if you voluntarily terminate your employment for any reason or if your employment is terminated for Cause in each case within the first one (1) year of your start date.

<u>Benefits</u>
You shall be eligible to participate in all of the employee benefits and benefit plans made available to similarly situated full-time regular employees, subject to the terms and conditions of such benefits and benefit plans, including group health insurance plans, phone coverage and company holidays. In addition, you shall be entitled to the following paid time off on an annual basis: 15 days paid time off (PTO) subject to the terms and conditions of the applicable PTO policies.  We will reimburse your business-related expenses in accordance with our reimbursement policies.

## Equity

Subject to ongoing employment it will be recommended to the Board that, after you start, you be granted a stock option (the "Option Award") to purchase ███ shares of JUUL Labs, Inc. common stock under the stock option plan then in effect. As is typical with grants of equity, such grant (and the timing of such grant) shall be subject to Board or Compensation Committee approval in its sole discretion.  To the extent eligible, the Option Award will be an incentive stock option; otherwise, it will be a non-qualified stock option.  The per share exercise price of the Option Award will be equal to the fair market value of the common stock on the date the Board actually approves the grant. The Option Award will vest over time as you provide services. The vesting schedule shall be over a four-year period starting on your first day of employment:  with 25% of the options shares vesting on the date that is one year after the date of your first day of employment, and, thereafter, the remaining 75% of the shares will vest at the rate of 1/36 per month for three years, subject to your continuous service. The Option Award will be evidenced by a standard stock option agreement, and will be subject to the terms and conditions of that agreement and the stock option plan under which the Option Award is granted. Such terms and conditions will include the vesting schedule and pre-requisites for exercising the Option Award.

## Severance

In the event the Company terminates your employment without Cause, subject to your execution and delivery to the Company of a Release (as defined as a general release of claims against the Company and its successors and their respective officers, directors, stockholders, agents and affiliates, in a form to be provided by the Company) that becomes effective and irrevocable within sixty (60) days following termination of your employment, the Company will pay you severance in an amount equal to six (6) months of your then-annual base salary in effect immediately prior to termination of your employment in a lump sum, subject to standard payroll deductions and withholdings, at the time the Release becomes irrevocable.

## Definitions

For purposes of this letter agreement, the term "Cause" shall mean any of the following: (i) any material breach of any material written agreement between you and the Company and your failure to cure such breach within 30 days after receiving written notice thereof; (ii) any failure to comply with the Company's material written policies or rules as they may be in effect from time to time; (iii) your repeated failure to follow reasonable and lawful instructions from the Board, Chief Executive Officer or Chief Financial Officer and your failure to cure such condition within 30 days after receiving written notice thereof; (iv) your conviction of, or plea of guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in, material harm to the business or reputation of the Company; (v) your commission of or participation in an act of fraud against the Company; (vi) your intentional material damage to the Company's business, property or reputation; or (vii) your unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom you owe an obligation of non-disclosure as a result of your relationship with the Company.  For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of your death or disability.  The foregoing definition does not in any way limit the Company's ability to terminate your employment at any time, and the term "Company" will be interpreted to include any subsidiary, parent, affiliate, or any successor thereto, if appropriate.

## "At Will" Employment

Employment with the Company is "at-will."  This means that it is not for any specified period of time and can be terminated either by you or by the Company at any time, with or without advance notice, and for any or no particular reason or cause.  It also means that your job duties, title, responsibilities, reporting level, compensation and benefits, as well as the Company's personnel policies and procedures, may be changed with or without notice at any time in the sole discretion of the Company.  The "at-will" nature of your employment is one aspect of our employment relationship that will not change during your tenure as an employee, except by way of written agreement expressly altering the at-will employment relationship and signed by you and by the Company's Chief Executive Officer or Chief Financial Officer.

## Reporting and Loyalty

You will initially report to the Company's **CFO.** Your report may be changed from time to time by the Company.  You agree to the best of your ability and experience that you will loyally and conscientiously perform all of the duties and obligations required of you.  During your employment, you will devote substantially all of your business time and attention to the business of the Company, the Company will be entitled to all of the benefits and profits arising from or incident to all such work services and advice, you will not render commercial or professional services of any nature to any person or organization, whether or not for compensation, without the prior written consent of the Company's Board, and you will not directly or indirectly engage or participate in any business that is competitive in any manner with the business of the

DocuSign Envelope ID: B343FD96-FC22-43E2-9765-B95D97257ABB

Company.  Nothing in this letter will prevent you from accepting speaking or presentation engagements in exchange for honoraria or from serving on boards of charitable organizations.

By signing and accepting this offer, you represent and warrant that:  (1) you are not subject to any pre-existing contractual or other legal obligation with any person, company or business enterprise which may be an impediment to your employment with, or your providing services to, the Company as its employee; and (2) you have not and shall not bring onto Company premises, or use in the course of your employment with the Company, any confidential or proprietary information of another person, company or business enterprise to whom you previously provided services.

<u>Disputes</u>
Except as prohibited by law, each of you and the Company agrees that, any claim, controversy or legal dispute between them or between you and the Company (or between you and any current or former officer, director, shareholder, agent or employee of the Company or its subsidiaries, each of whom is hereby designated a third-party beneficiary of this letter agreement regarding arbitration), arising out of your employment or termination of such employment or this letter agreement (a "Dispute") will be re-solved through binding arbitration in San Francisco County, California under the Federal Arbitration Act and, to the extent not inconsistent with or preempted by the Federal Arbitration Act, the Arbitration Rules set forth in California Code of Civil Procedure Section 1280 et seq.  THE PARTIES UNDER-STAND THAT BY AGREEING TO ARBITRATE DISPUTES THEY ARE WAIVING ANY RIGHT TO A JURY TRIAL.  The parties agree that such arbitration shall be conducted on an individual basis only, not a class, representative or collective basis, and hereby waive any right to bring class wide, collective or representative claims before any arbitrator or in any forum. This arbitration provision is not intended to modify or limit the substantive rights or remedies available to the parties, including the right to seek interim relief, such as injunction or attachment, through judicial process, which shall not be deemed a waiver of the right to demand and obtain arbitration. Any Dispute that is not arbitrated, including any judicial action to enforce this arbitration provision will be litigated exclusively in federal or California courts located in San Francisco County, California, and the parties hereby consent and submit to the jurisdiction and venue of such courts.

<u>Notices</u>
All notices under this letter agreement shall be in writing and shall be deemed to have been duly given as of the delivery date when delivered in person and as of the third business day after mailing if mailed by certified or registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below:

|                      |                                        |
|----------------------|----------------------------------------|
| To the Company:      | JUUL Labs, Inc.                        |
|                      | Attn:  General Counsel                 |
|                      | 560 20th Street                        |
|                      | San Francisco CA 94107                 |
|                      |                                        |
| To Employee:         | To the address then on file with the Company |

<u>Conditions</u>
This offer, and any employment pursuant to this offer, is conditioned upon the following:

(a) Your ability to provide satisfactory documentary proof of your identity and right to work in the United States of America on or before your third day of employment.  Enclosed is the INS Form I-9, Employment Eligibility Verification, the second page of which includes a description of acceptable documentary proof.
(b) Your signed agreement to, and ongoing compliance with, the terms of the enclosed Proprietary Information and Inventions Assignment Agreement.
(c) Your execution and return of the enclosed copy of this letter to JUUL Lab's Recruiting Team no later than 5 days from the date of this letter, after which time this offer will expire.
(d) Your offer is contingent upon successful completion of a background check, including Company review of the data received in the background check

<u>Entire Agreement</u>
If you accept this offer, and the conditions of this offer are satisfied, this letter and the written agreements referenced in this letter shall constitute the complete agreement between you and the Company with respect to the terms and conditions of your employment.  This letter agreement shall supersede any existing employment arrangement or agreement with the Company.  Any representations, whether written or oral, not contained in this letter or contrary to those contained in this letter, that may have been made to you are expressly cancelled and superseded by this offer.  Except as otherwise specified

DocuSign Envelope ID: B343FD96-FC22-43E2-9765-B9ED97257ABB

in this letter, the terms and conditions of your employment pursuant to this letter may not be changed, except by a writing by Company's Chief Executive Officer or Chief Financial Officer.  California law shall govern this agreement, without regard to choice of law principles.  If any provision of this letter agreement is held invalid or unenforceable, such provision shall be severed, and the remaining provisions shall continue to be valid and enforceable.

We look forward to you accepting this offer and our having a mutually rewarding relationship.  As with all important decisions, you should make a decision concerning this offer based on your own independent investigation and judgment concerning the Company and its future prospects.

If you accept this offer, please date and sign below on the enclosed copy of this letter and return. This offer will expire 5 days from the date of this letter. Please retain the original of this letter for your records.   You should bring your Form I-9 required identification and proof of authorization to work with you.

Sincerely,

*Lee Readman*

E12B45A547144BA...

Lee Readman
VP, Talent & International HR

I accept the above offer, and will begin employment on the date set forth above:

Dated:  24-May-2018

*Siddharth Broja*

3DCFF718729C431...

Signature

-4-